**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 09-cv-00645-CMA-BNB

PATRICK TORREY,

    Plaintiff,

v.

QWEST COMMUNICATIONS COMPANY, LLC, as Administrator
of the Qwest Disability Plan,

    Defendant.

---

**ORDER OVERRULING AND REMANDING BENEFITS DETERMINATION**

---

    This is a disability income benefits dispute in which Plaintiff Patrick Torrey ("Plaintiff") is seeking long-term disability benefits as governed by the Employee Retirement Income and Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.* Plaintiff's complaint arises under 29 U.S.C. § 1132(a)(1)(B). The matter is before the Court on Plaintiff's motion for judgment based upon the administrative record (hereinafter referenced as "Rec."). (Doc. # 31.) For the reasons discussed below, the plan administrator's denial of benefits is OVERRULED, and the matter is REMANDED to the plan administrator for further proceedings consistent with this opinion.

## I. **FACTUAL BACKGROUND**[1]

**A. THE PLAN**

This dispute concerns Defendant Qwest Communications Company, LLC's ("Qwest") denial of long-term disability (LTD) benefits to Plaintiff.

The Qwest Disability Plan, effective as of January 1, 2007 ("Plan") is an ERISA-governed employee welfare benefit plan within the meaning of 29 U.S.C. § 1002(1) providing benefits to eligible employees with a "Disability." The Plan is funded by Qwest. The Plan allows for delegation of plan administration to a third party administrator ("TPA") and grants the plan administrator or the TPA broad discretionary authority to determine eligibility for benefits. As compensation, the TPA receives a set amount per month based on the number of employees employed by Qwest. This compensation is unrelated to the approval or denial of disability claims.

The Plan provides for two types of long term disability: long term disability based on the inability to do one's own occupation and long term disability based on the inability to work in any occupation ("LTD"). With respect to the latter, the Plan provides:

> After a Participant has received LTD benefits for 12 months, Disability means (1) the Participant is unable to engage in any occupation or employment, which inability is supported by Objective Medical Documentation, or (2) the Participant is unable to engage in any occupation or employment for which he may reasonably become qualified for by training, education or experience, other than a job that pays less than

---

[1] Unless otherwise noted, the following facts are undisputed and taken from the Administrative Record.

2

>       60% of his Base Pay at the time the Participant terminates
>       employment due to the Disability.

(Rec. 10).

Objective Medical Documentation is defined as "written documentation of observable, measurable, and reproducible findings from examination and supporting laboratory or diagnostic tests, assessment or diagnostic formulation, such as, but not limited to, x-ray reports, elevated blood pressure readings, lab test results, functionality assessments, psychological testing, etc." (Rec. 12.)

The Plan also requires participants seeking LTD benefits to fulfill various obligations. First, the Plan requires participants to apply for Social Security Disability Insurance Benefits ("SSDIB") when eligible. With this requirement, the participant "shall also be required to sign a reimbursement agreement . . . which shall entitle the Plan Administrator to: (i) obtain information directly from the Social Security Administration and (ii) recover amounts from the Participant that are subsequently paid by Social Security," and the participant shall "provide a copy of all Social Security determinations to the Plan Administrator within 30 days of receipt by the Participant." (Rec. 30.) If the participants choose to use the services of Qwest's contracted vendors who provide Social Security advocacy services, the Plan provides for the payment of the fees related thereto.

Additionally, the Plan requires the participant to seek proper care and treatment from an approved provider, follow a recommended treatment plan, and provide documentation supporting "Disability" to the plan administrator upon request. This

3

documentation "must support the claim for Disability and include Objective Medical Documentation, and any other information relevant to the nature and duration of the Disability, as well as a plan for treatment or management of the problem." (Rec. 33-34.)

### B.  PLAINTIFF'S MEDICAL HISTORY

Until June 5, 2006, Plaintiff was employed by Qwest as a network technician. This position entails significant lifting and climbing and falls in the "heavy" labor category. As an employee of Qwest, Plaintiff was a qualified participant in the Qwest Disability Plan ("Plan").

Plaintiff has a history of leg and back pain, beginning as a young child when he was run over by a car. Plaintiff claims that, in approximately June 2006, he fell down some stairs in his home and this aggravated his symptoms. In June of 2006, he was treated by Dr. James Gregory who diagnosed Plaintiff with sciatica, low back pain and lumbar disc generation. This injury prevented Plaintiff from performing his duties as a network technician. As a result, Plaintiff stopped working on June 5, 2006.

On June 27, 2006, an MRI was conducted at the order of Dr. Gregory. The MRI showed "moderate right lateral disc bulging at L5-S1 resulting in impingement upon the Right L5 nerve root but without effacement of the majority of the surrounding epidural fat. Minimal central disc bulging at L5-S1 without spinal stenosis." Conservative treatment of the herniated disc failed to alleviate Plaintiff's pain. During this time, Plaintiff attempted to return to work twice but was unable to do so.

In July 2006, Plaintiff was referred to Dr. Amit Argarwala, an orthopedic surgeon. Both Dr. Argarwala and a second orthopedic surgeon, Dr. McPherson, recommended surgical intervention. Prior to Plaintiff's surgery, Dr. Gregory stated that Plaintiff continued to be unable to work. On January 31, 2007, Dr. Argarwala performed an "anterior spinal fusion with instrumentation at L5-S-1." Following this lumbar fusion and disk replacement surgery, Plaintiff participated in follow-up care. When Plaintiff reported no improvement, though the surgery appeared to be successful, Plaintiff's doctors ordered an EMG to assess his condition. Dr. Romagosa performed the EMG on May 6, 2008 and reported abnormal results, confirming the diagnosis of chronic L5 radiculopathy. Plaintiff's doctors also observed, consistent with this diagnosis, right calf atrophy and decreased strength on the right planar flexion. Following the surgery, Plaintiff's doctors treated him pharmaceutically to help alleviate this pain.

Dr. Peter Reusswig, a pain management specialist, saw Plaintiff on three occasions from December 12, 2008 through January 16, 2009. Dr. Reusswig diagnosed Plaintiff in December 2008 with failed back surgery syndrome, neuropathic pain, myofacial pain, myospasms, and "opioid dependency for pain control, opioid tolerance." Dr. Reusswig recommended in February 2009 that "the patient be limited to part-time work only based on his diagnosis and present pain complaints" and believed that Plaintiff would not be competitive for full time work. Dr. Reusswig also understood that, due to Plaintiff's loss of benefits, Plaintiff was not able to undergo interventional

care that would control his pain and thereby allow him to wean off of opiates and improve his level of function.

## C.    PLAINTIFF'S CLAIM HISTORY

At the time Plaintiff stopped working in June 2006, he began receiving short-term disability ("STD") benefits, which he received for a total of 52 weeks, through June 21, 2007.

After Plaintiff exhausted 52 weeks of STD benefits, Plaintiff applied for long-term disability benefits. Those benefits were approved effective June 22, 2007. This approval provided Plaintiff with LTD benefits for 12 months from June 22, 2007 through June 21, 2008, based on the Plan's definition of Disability for the first 12 months - that he could not perform his last company assigned job of Network Technician. Plaintiff received LTD benefits from approximately June 22, 2007 until December 31, 2008.

Pursuant to the Plan's provision for periodic review of documentation supporting a participant's continuing entitlement to LTD benefits, on April, 22, 2008, the TPA requested information from Plaintiff. In response to the TPA's request, Plaintiff's then treating physician, Dr. Angelo Romagosa, provided medical records, including EMG findings with evidence of chronic L5 radiculopathy on the right. Dr. Romogosa, however, failed to set forth his opinion regarding Plaintiff's ability to work with or without restrictions. In order to evaluate Plaintiff's right to continued benefits, the TPA retained an independent third part to arrange an Independent Medical Examination ("IME") of Plaintiff.

On October 10, 2008, Dr. Anil Agarwal conducted the IME and issued a 22-page report.[2] The IME report summarizes Plaintiff's then-present medical status, past medical history, and past/present treatment and work history. The IME report then provides a review of Plaintiff's medical records from June 5, 2006, through the IME date and a summary of diagnostic studies performed during that time period. Included in the medical record summary, Dr. Agarwal notes Dr. Argawala's assessment in August 2006 that Plaintiff suffered from "Degenerative disc lumbar without myelopathy, radiculitis, thoractic and LS", the second opinion by Dr. Lawrence Lesnak, a doctor in rehabilitation and occupational medicine, the operative report from Plaintiff's surgery, and the treatment by Dr. Romagosa from October 2007 through May 2008. The diagnostic studies include the pre-surgery MRI, lumbar spine spot film overreads and the May 2008 EMG study. The IME report notes Plaintiff's pain narcotic medications. The IME report continues with a report of Dr. Agarwal's physical examination of Plaintiff, finding tenderness in the lumbar spine, a questionable positive straight leg test, and shoulder tenderness. The IME report finds no neurologic deficit.

Based on this, the IME Report provides the following diagnosis:

- acute mild lumbar strain, temporary aggravation
- L5-S1 degenerative disc disease with lumbar radiculitis, status post (i) partial corpectomy of S1 with complete diskectomy of L5-S1 from anterior approach (ii) anterior spinal fusion L5-S1 with placement of intervertebral spacer

---

[2] Plaintiff tape recorded the examination and provided to the Court a transcript of the recording made by a certified court reporter. However, because these materials are not part of the administrative record, the Court does not consider them.

- Narcotic prescription drug dependence
- Symptom magnification/malingering.

(Rec. 433). The malingering diagnosis was based on a single Waddell sign, the bilateral leg raise.[3] Dr. Agarwal also suggested Plaintiff's back surgery was unreasonable and unnecessary.

The IME report concludes that Plaintiff can return to full time work with the following restrictions:

> **Sitting**: no more than 4 hours per 8 hour work day;
> **Lifting**: limited to 15lbs. only;
> **Carrying**: limited to 15lbs. only;
> **Walking**: no more than 2 to 3 hours per 8 hour work day; and
> **Standing**: no more than 4 hours per 8 hour work day

(Rec. 435).

Following receipt of the IME Report, Defendant commissioned a transitional skills analysis ("TSA") to determine whether Plaintiff was employable in the Denver area given his education, skills and work restrictions. The TSA was conducted by Katheryn Duder, a Certified Rehabilitation Consultant. According to the TSA, the finding of the IME was "a diagnosis of acute mild lumbar strain, temporary aggravation." Based on this partial diagnosis, the TSA concluded that Plaintiff could perform a number of available jobs in the Denver area in the light and sedentary categories, including sales representative, dispatcher, communications consultant, and maintenance service

---

[3] Plaintiff notes that some in the medical community question the use of Waddell signs to diagnosis malingering. If use of the test is proper, Plaintiff claims that at least 3 of the 5 (sometimes 8) Waddell signs must be present for a proper diagnosis of malingering.

dispatcher. According to the Dictionary of Occupational Titles ("DOT"), the requirements for all four of the jobs identified exceed Plaintiff's abilities as determined in the IME. Specifically, the dispatcher job is classified as sedentary and involves sitting 95% of the time, and the maintenance service dispatcher job is also classified as sedentary which "involves sitting most of the time." Additionally, the sales representative and communications consultant positions are classified as "light", which involves exerting up to 20 lbs. occasionally. However, Ms. Duder stated:

> Based on my expertise, referral information, and research resources the occupational options listed [ ] would be appropriate for the claimant . . .. I have learned through previous research that the occupations listed [ ] do not require lifting of over 15 pounds or carrying of over 10 pounds. Even though some of them are classified as light they are sedentary with regards to the lifting.

(Rec. 258).

On January 12, 2009, Plaintiff was informed that his LTD benefits were denied effective December 31, 2008, on the basis that the medical evidence demonstrated that he was not "Disabled" as defined by the Plan's greater than 12 month definition of Disability. The TPA relied on the diagnosis of Plaintiff's condition including:

- Degenerative lumbar disc disease with lumbar radiculitis
- Status post partial corpectomy of S1 with complete disckectomy of L5-S1 from anterior approach
- Status post anterior spinal fusion of L5-S1 with placement of intervertebral spacer of 1/31/07
- Recent acute mild lumbar strain, temporary aggravation

(Rec. 245-249). The TPA did not rely on the "symptom magnification/malingering" diagnosis but did rely on the work restrictions recommended by the IME physician.

Plaintiff's counsel pursued an appeal of the LTD denial to the TPA Appeals Board on approximately February 2, 2009. As part of this, Plaintiff (1) informed the TPA that he had been approved for social security disability benefits though he did not provide the SSA determination, (2) provided updated records from Dr. Reusswig, (3) clarified the documents to be included in the appellate record, and (4) opined on the TSA findings.

As part of the appellate review, a second independent orthopedic surgeon, Dr. Klaen, reviewed Plaintiff's records and concluded that she was "in complete agreement with the IME by Dr. Anil Agarwal performed on October 10, 2008" and that Plaintiff was not Disabled as defined by the Plan. The TSA Appeals Board upheld the denial of benefits, reiterating the diagnosis used in the initial denial. The final denial noted the requirement that Plaintiff seek SSDIB when eligible, but otherwise made no mention of Plaintiff's SSDIB award.

## II. PROCEDURAL HISTORY

On March 24, 2009, after having exhausted his administrative remedies, Plaintiff filed a Complaint (Doc. # 1) against Qwest seeking reinstatement of his LTD benefits.

On November 2, 2009, Plaintiff filed his Opening Brief (Doc. # 31) based on the administrative record. Qwest responded on December 14, 2009 (Doc. # 46) and Defendant replied on January 6, 2010. (Doc. # 49).

### III. **STANDARD OF REVIEW**

Ordinarily, the Court reviews *de novo* an administrator's decision to deny benefits, unless the plan provides otherwise. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343, 2344, 2348 (2008). If, however, the plan affords "the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," the Court determines whether the denial of benefits was an abuse of discretion, *i.e.*, was arbitrary and capricious. *Murphy v. Deloitte & Touche Group Ins.*, 619 F.3d 1151, 1157 (10th Cir. 2010). Under this standard, the administrator's decision will be upheld "so long as it is predicated on a reasoned basis," and supported by substantial evidence. *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006). Substantial evidence means "more than a scintilla but less than a preponderance." *Rekstad v. U.S. Bancorp.,* 451 F.3d 1114, 1119-20 (10th Cir. 2006). "[T]here is no requirement that the basis relied upon be the only logical one or even the superlative one." *Id.* Thus, the Court asks only "whether the administrator's decision resides somewhere on a continuum of reasonableness – even if on the low end." *Id*. (quotations and citations omitted).

Where, however, the same entity funds the plan and evaluates the claims, an inherent, dual-role conflict of interest exists. *Glenn*, 128 S.Ct. at 2348; *see also Cirulis v. UNUM Corp. Severance Plan*, 321 F.3d 1010, 1017 n.6 (10th Cir. 2003). Because a conflicted administrator does not necessarily result in conflicted decision making, the existence of a dual-role conflict does not alter the standard of review. *Glenn*, 128 S.Ct.

at 2350. Rather, a reviewing court weighs the conflict as one of the many case-specific factors in determining whether the administrator's decision was an abuse of discretion. *Id.*; *Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1192 (10th Cir. 2009) . A reviewing court should employ a sliding scale approach in which the conflict is accorded more or less weight depending upon the seriousness of the conflict, giving it greater weight "where circumstances suggest a higher likelihood that it affected the benefits decision" and less weight where the administrator has minimized the risk that the conflict would impact the benefits decision.[4] *Glenn*, 128 S.Ct. at 2351; *see Murphy*, 619 F.3d at 1157-58.

In this case, The parties do not dispute that the Plan gives Qwest discretionary authority to determine eligibility for benefits and to construe the terms of the Plan. Accordingly, the Court will review Defendant's denial of long term benefits to determine whether the denial was arbitrary and capricious, or whether the decision was reasonable and based on substantial evidence in the record. *See Sandoval v. Aetna*

---

[4] Qwest advocates the use of burden-of-proof rules, namely, Plaintiff has the burden of establishing a conflict of interest, and if successful, the burden shifts to the defendant to prove the reasonableness of the benefit determination. In doing so, Qwest relies on pre-*Glenn* Tenth Circuit case law. Although the Tenth Circuit has interpreted its pre-*Glenn* sliding scale approach to be consistent with *Glenn*, the Tenth Circuit, nevertheless, has recognized that Glenn abrogated the burden shifting approach. *Murphy*, 619 F.3d at 1157 n.1 (citing *Weber v. GE Group Life Assurance Co.*, 541 F.3d 1002, 1011 (10th Cir. 2008) (sliding scale); *Holcomb*, 578 F.3d at 1192 (quoting *Glenn*'s holding that it is not "necessary or desirable for courts to create special burden-of-proof rules, or other special procedural or evidentiary rules focused narrowly upon the evaluator/payor conflict."). Thus, as instructed, the Court will consider the circumstances in the record that indicate the seriousness of the conflict and weigh the conflict with the other factors accordingly.

*Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992) (stating that a decision is not arbitrary and capricious if it is based on substantial evidence in the record).

### IV. ANALYSIS

**A. CONFLICT OF INTEREST**

While the parties agree an arbitrary and capricious standard applies, it is also undisputed that an inherent conflict of interest exists because Qwest both funds and administers the Plan. Therefore, as a threshold issue, the Court must determine the weight Qwest's conflict of interest should carry in determining whether the TPA's denial of benefits was arbitrary and capricious.

To begin, the Court considers whether the circumstances indicate the conflict exerted influence on the TPA's denial of benefits. As support for Qwest's contention that the conflict had no such effect, Qwest points, first, to the fact that the TPA's compensation is based on the number of Qwest employee's and not whether the employees' disability claims are approved or denied and, second, to the two independent medical evaluations, or IME's, conducted by the TPA.

On the other hand, Plaintiff notes the TPA's failure to consider the Social Security Administration's ("SSA") favorable disability determination despite Qwest's insistence that Plaintiff seek SSA benefits. This point is of particular significance in light of the Supreme Court's decision in *Glenn*. As the Supreme Court instructs, an administrator's encouragement to a plaintiff to apply for Social Security Disability Insurance Benefits ("SSDIB") and its subsequent failure to consider the SSA determination of disability is a

13

"serious concern" that needs to be considered when evaluating the administrator's conflict of interest. *Glenn*, 128 S.Ct. at 2352. In this case, Qwest's conduct goes far beyond mere encouragement. The Plan **required** that Plaintiff apply for SSDIB in order to be eligible for long term benefits, and Qwest even hired a third party consultant to advocate on Plaintiff's behalf before the SSA. (Rec. 33-34, Plan, ¶ 5.1(c)-(d); Rec. 214, Letter from Advantage 2000 Consultant). Additionally, the Plan obligated Plaintiff to sign an agreement which entitled the TPA to obtain information directly from the SSA, even though it also required Plaintiff to submit a copy of all SSA determinations. (Rec. 30, 33-34, Plan, ¶¶ 4.12 (a)-(b), 5.1(d)(iii).) As to this last point, the parties do not dispute that Plaintiff failed to provide the SSA's determination of disability. However, neither party addresses whether Plaintiff provided authority to the TPA to independently procure the determination, and if so, why Qwest chose not to do so in this case. Qwest simply contends that it did not consider the SSA determination because Plaintiff did not provide it.

The Court recognizes that a contrary SSA determination does not inherently render the TPA's denial of benefits arbitrary and capricious. *See Wagner-Harding v. Farmland Indus. Inc. Employee Retirement Plan,* No. 01-3085, 2001 WL 1564041, *5 (10th Cir. Dec. 10, 2001) (noting the different standards and bodies of law governing disability determinations under SSA and ERISA). However, without securing and considering the SSA determination, the TPA made its decision without adequate evidence. If the plan administrator "fails to make adequate findings or to explain

adequately the grounds of her decision," the most prudent course of action "is to remand the case to the administrator for further findings or explanation." *Caldwell v. Life Insurance Co. of N. America,* 287 F.3d 1276, 1288 (10th Cir. 2002); *accord DeGrado v. Jefferson Pilot Financial Ins. Co.*, 451 F.3d 1161, 1175 (10th Cir. 2006). Nevertheless, remand is unnecessary if the record clearly shows the TPA abused its discretion or "the case is so clear cut that it would be unreasonable for the [TPA] to deny the application for benefits on any ground." *Caldwell*, 287 F.3d at 1289 (citation omitted). *Cf. DeLisle v. Sun Life Ins. Co. of Canada,* 558 F.3d 440, 446, 448 (6th Cir. 2009) (affirming district court's finding that denial was arbitrary and capricious in view of conflict of interest, and administrator's failure to acknowledge SSDIB award, and substantial medical evidence of the plaintiff's disability). Thus, before deciding whether remand is appropriate, the Court will consider the merits of the case.

**B.     THE MERITS**

The Court finds this is a close case as there is a lack of strong evidence on either side demonstrating the nature and extent of Plaintiff's disability. It is undisputed that Plaintiff suffered degenerative disc disease and resulting radiculitis. The dispute, therefore, centers around whether Objective Medical Documentation demonstrates this impairment precluded Plaintiff from working full time in any occupation.

In support of his inability to work in such a position, Plaintiff proffers his SSDIB award and the opinions of two of his treating physicians, Dr. Gregory and Dr. Reusswig. The Court has already addressed Plaintiff's SSDIB award above. Without having the

opinion of the SSA, neither the Court nor the TPA can determine its relevance to whether Plaintiff can work any occupation as defined by the Plan. Additionally, Dr. Gregory's September 12, 2006 diagnosis that Plaintiff was unable to work was given months prior to Plaintiff's back surgery. Thus, its relevance to Plaintiff's ability to work post-surgery is limited at best. Lastly, on February 20, 2009, Dr. Reusswig recommended that Plaintiff be limited to part-time work only "based on his diagnosis and present pain complaints." Contrary to Qwest's assertion, the evidence suggests that Dr. Reusswig considered Plaintiff's medical history and diagnosis in making this recommendation. (Rec. 163: "Without reiterating his entire history, and based on the three visits that I have had with him . . ."; and 169 regarding visit of December 12, 2008: "SOURCE OF INFORMATION: Records were reviewed. The patient's pain diagram, pain questionnaires, history and physical.") That said, it does not appear from the record that Dr. Reusswig conducted an examination on February 20, 2009, to obtain objective evidence of Plaintiff's "present pain complaints."

Qwest's objective evidence is no better. The IME physician's diagnosis of Plaintiff included "symptom magnification/malingering." (IME Report, Rec. 433-35.) Qwest has since conceded that malingering is not supported by the evidence and, therefore, tries to immunize the TPA's decision by arguing that it did not rely on this diagnosis. Such an argument however overlooks the fact that the TPA denied benefits based on Plaintiff's alleged ability to work within the IME physician's recommended work restrictions. (Denial on Appeal, Rec. 101-102.) These work restrictions were based on

the IME physician's own malingering diagnosis. (IME Report, Rec. 433-35.) Thus, any opinion that relies on the IME's work restrictions – from the TSA to the TPA's denial – is called into question. The only other objective evidence Qwest provides is the appellate review of Dr. Kalen. Because she was in "complete agreement with the evaluation of the IME," however, her report suffers from the same infirmities as the IME.

Accordingly, the evidence of record does not conclusively show whether Plaintiff is entitled to LTD benefits. Remand is appropriate in order to allow the TPA to consider additional evidence. On remand, the TPA should be provided with a copy of the Plaintiff's SSA disability determination. In addition, the parties may supplement the record with additional objective medical evidence that bears on Plaintiff's claim. The supplementation shall be complete within 30 days of this decision. The TPA shall complete its review and processing of Plaintiff's claim within 90 days of the date of this decision, following which Plaintiff may again seek review in this Court, if necessary. Should Plaintiff again seek to argue that Qwest's conflict of interest influenced the TPA's decision, both parties may present evidence on the extent of the conflict and any safeguards taken to avoid such influence.

## V. CONCLUSION

It is, therefore,

ORDERED that Qwest's denial of Plaintiff's long-term disability benefits is OVERRULED. It is

FURTHER ORDERED that the case is REMANDED to the plan administrator for further proceedings consistent with this opinion. It is

FURTHER ORDERED that the Court will retain jurisdiction over the case, but the case will be administratively closed pending the TPA's reconsideration of Plaintiff's claim for LTD benefits.

DATED: February  28 , 2011

BY THE COURT:

*Christine M Arguello*
_____
CHRISTINE M. ARGUELLO
United States District Judge